This is a little bit different because we did combine some cases that are related to each other, so it's 40 minutes per side, but each individual lawyer has a certain amount of time, so please take a look. And when it turns yellow, know that you're running out of time. When it turns red, you are done, unless we're still asking you questions, in which case you can't run out the door. You need to answer our questions. So with that, we will go ahead and get started on this case. Number 23-20181, 23-20450, 23-20363, 23-20451, Excluded Lenders v. Serta, Simmons, and a lot of others. And we'll start with Cannon-Shammocam. Thank you, Judge Haynes. Cannon-Shammocam of Paul Weiss for the Excluded Lender Appellants. May it please the Court, Judge Jones erred in two critical respects in these bankruptcy proceedings, and this Court should accordingly grant relief to the Excluded Lenders. First, the Bankruptcy Court erred by holding that the 2020 transaction qualified as an open market purchase of Serta's existing debt from the favored lenders, and on that basis that the 2020 transaction was exempt from the pro rata sharing provision under the 2016 credit agreement. The 2020 transaction had none of the hallmarks of an open market purchase, and it was a far cry from the paradigmatic open market purchase in the established secondary market for bank debt. Second, the Bankruptcy Court erred by confirming a reorganization plan that simply copied a conceivably impermissible pre-petition indemnity provision. A party cannot circumvent the provisions of the Bankruptcy Code in this fashion. And the practical effect of the Bankruptcy Code's decision is to render the prohibition on contingent reimbursement claims of co-liable entities a legal nullity. This Court should reverse the Bankruptcy Court's order granting partially summary judgment on the open market purchase issue, and it should reverse the order confirming the plan insofar as it approves the plan indemnity. Okay, but you agree that if we affirm the first one, we wouldn't get to the second one? That's correct. Obviously, from the perspective of our clients, the first issue is the threshold issue and, frankly, the most important one, because the indemnity issue ultimately is really an issue between CERTA and the favored lenders. Now, I want to spend just 30 seconds on the jurisdictional issue raised by CERTA, just to get that out of the way before we get to the merits here. The straightest line to a conclusion that there's no jurisdictional problem here is simply that this is an appeal under Section 158d2a. And so this is a case that comes to this Court on a petition for discretionary review. And for jurisdictional purposes, that statutory scheme is no different from perhaps the more familiar petitions for discretionary review that this Court sees all the time under Section 1292b, when a party seeks interblockatory review of an ordinary order in a civil proceeding under Rule 23f in the context of a class action. The statutory scheme makes clear that it is the order granting the petition that confers jurisdiction on this Court. The requirement of a notice of appeal is applicable, most notably under Section 158a, when a party is going directly to the district court. But those are alternative mechanisms for obtaining appellate review. Even if that were not true, we of course have our argument that the terms of Rule 8003 make clear that the failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal. And the rule makes quite clear that the inclusion of the order being appealed is no different from the filing fee. It accompanies the notice of appeal, and that requirement does not go to timely filing. And so that's really all that is required to dispose of the jurisdictional objection. Now, I want to turn, unless the Court has any questions about that, to the merits and to the open market purchase issue. Now, our position here is that an open market purchase has three characteristics. And we don't take the position that those characteristics are requirements. Instead, we take the position that a court should assess those characteristics to determine whether, taking all of the facts into consideration, the transaction is substantially similar to the paradigmatic type of transaction that takes place on an open market. And as we explained in our brief at some length, there is a well-established secondary market for this sort of debt, and this transaction for none of the relevant hallmarks. So just to walk through those three requirements. The first is a transaction that involves a simple exchange of cash or cash-equivalent consideration for the company's debt. We derive that characteristic from the ordinary understanding of the term purchase. Can I ask you a sort of broader question? I understand why you all didn't like the 2020. I'm wondering, as we stand here today, or sit here, how is that impacting how much money your clients will receive in the bankruptcy? Well, as a practical matter, the consequence of this is that we have an independent claim, which obviously preexists the bankruptcy proceeding. It was a subject of litigation in New York State Court. It then got swept up into the bankruptcy in an adversary proceeding. And this is really, Judge Haynes, just a straight-up breach-of-contract-type claim. In other words, what we are trying to recover here is the excess value that we were entitled to, in our view, under the pro rata sharing provision. So it is certainly true that CERDA has now emerged from bankruptcy. The favored lenders are, you know, effectively the majority owners. They control CERDA for all practical purposes going forward. But this is really a claim that, in our view, is sort of independent from CERDA's emergence from bankruptcy. In other words, if this Court were to rule in our favor, the effect would be to reverse the summary judgment in the adversary proceeding. It would have no effect on the confirmation. I hope that's responsive to your question. Well, no, I'm trying to understand. I guess the basic premise is that the 2020 took away money from the excluded lenders. And I'm wondering, okay, well, now we've had a bankruptcy and a Chapter 11 and la, la, la, la, la. How has that really happened? That's what I'm trying to understand. Yeah, so let me sort of come at it from a different direction. If the summary judgment were to be reversed here, what would happen would be that the case would go back. We think that the case should end up in the Southern District of New York, as the Court will be aware. And then we will be able to proceed to essentially calculate the amount to which we were entitled. And, again, our claim here is that we are entitled to the delta that the favored lenders received in 2020. So, you know, to put kind of a more specific meat on the bones of this, as the Court will be aware, I think it's essentially undisputed that this transaction took place at a substantial premium. So the favored lenders essentially received a 70 percent premium for the debt that was exchanged in this transaction. That is the excess value to which we are entitled in our view. That runs to hundreds of millions of dollars. And notwithstanding the fact that CERDA has emerged from bankruptcy, we would be able to proceed on our claims in order to seek to recover that. Now, the fact that this was a debt-for-debt exchange is one of the critical factors that illustrates why this was not an open market purchase. Really, the fundamental core of our submission, I've set out the first of the hallmarks. The other two are a transaction that occurs in a market in which any buyer or seller can participate if they so choose. The third is a transaction that takes place at or near the market price. Here, what took place didn't resemble a repurchase at all. It was a complete restructuring. The whole point of this transaction was to essentially allow CERDA to obtain an infusion of new money. And so this was not a situation in which, for instance, the issuer of debt was seeking to repurchase debt in order to retire it. And the whole point of the exceptions to the pro rata sharing requirement is to enable an issuer to do exactly that without disadvantaging other debt holders in the same class. If you have, for instance, a purchase on the secondary market or if you have a purchase in a Dutch auction, the result for the remaining lenders whose debt is not repurchased is ordinarily a net positive because what you've basically done is taken debt out of the equation and therefore made the collateral available to the remaining debt holders. Here, by contrast, the effect was not only to benefit the favored lenders. It was to disadvantage the excluded lenders, my clients. What's the best evidence of that? It is that on the secondary market, the value of my client's debt immediately dropped when this transaction was completed. It dropped from 43 cents to 31 cents. So, Judge Haynes, that is really what this dispute is about. We are seeking to vindicate this underlying contractual right. And, again, the fact that CERDA has gone through the bankruptcy is kind of perpendicular to that. In other words, CERDA obviously has emerged as a going concern, but the resolution of this adversary proceeding really doesn't touch the confirmation and CERDA's proceeding forward from the confirmation. And, indeed, at least with regard to the indemnity issue. I was going to say that if that's withdrawn off of the confirmation, what effect does that have? If anything, it's a net positive for CERDA because, obviously, CERDA would then be free of the indemnification obligation. And so that is why, if we prevail in the indemnity appeal, there's no need to unwind the confirmation. This Court can do what it has routinely done in other contexts, which is simply to excise the indemnity provision and the parties can then proceed on their way. Mr. Shamingham, can I ask you about the LSTA guide?  So, I take it that your response on, it's obviously definitive or authoritative guide in the industry, says that there can be these one-to-one transactions that would nonetheless satisfy the open market provision. I take it your response is, number one, you don't dispute that you can have open market transactions that don't go through broker-dealers the way I would understand the normal secondary market. Correct. But then, number two, I'm confused by this sentence in the reply brief that says, the LSTA guide contemplates only negotiations between a borrower and individual lenders in a simple transaction, not a bespoke multi-party deal. Can you help me understand what would be a simple one-to-one transaction between a lender and a borrower that would be open market under the LSTA guide or the provision in the agreement here, but that wouldn't implicate pro-rata sharing? So, Judge Oldham, a hypothetical that we've come up with that we think probably would satisfy the open market purchase requirement is a situation in which, for instance, an issuer essentially solicits parties to sell back their debt, and then rather than entering into the transaction on the open market, simply after receiving those proposals, enters into that transaction without the involvement of a broker-dealer. And so that is an open transaction in the critical sense, and that anyone can participate in that transaction. Got it. This transaction is—sorry, go ahead. I was just going to say this transaction is different for the simple reason that, you know, number one, it was exclusionary. This was not a situation in which CERDA said, you know, we have this up-tier transaction. Would you like to participate in it? Quite to the contrary, CERDA was negotiating independently with these two groups about different types of transactions. And, of course, the first we learned of the up-tier transaction was when it became public. But second, this was a much more complex transaction. And that is true not just because the exchange of the debt was coupled with the issuance of new debt. It was because this required significant changes, not just to this credit agreement, but, of course, the issuance of other agreements. And all of those things, I think, can be taken into account. Our fundamental submission to this Court is that it can reverse Judge Jones quite readily without attempting for all purposes and all times to offer a precise definition of open market purchase. I think we recognize that there might be difficult edge cases. This is not one of them. As to these facts, we believe that the ordinary understanding of open market purchase is unambiguous. And Judge Jones' reasoning here was threadbare. If you look at page 33402, his oral ruling said, I sit in with these matters every single day, and it is very clear to me that this is what was intended by the agreement. He did not consider any of the evidence of custom or usage. We have no reason to believe that Judge Jones had ever encountered this question before, not least because we are only aware of two reported decisions that have ever considered this issue. And, again, we rely on the ordinary understanding of the phrases open market and purchase. And, certainly, if you look at the evidence of custom and usage, we believe that that evidence strongly supports our position. We had a trader, a lawyer, and a professor, all of whom provided extensive testimony about how these provisions came to be, how the secondary debt market works, and Judge Jones did not consider any of that. And if you had to give, in 15 seconds, if you could explain, if you had just one simple answer as to why the offer that your clients made wasn't, I'm sorry, was an open market transaction, but this one wasn't. By that I mean the drop-down deal where you're going to take the IP and put it into the separate sub. That was an open market deal, I thought. I'm frankly not sure that it would have been. And, to be sure, the other side relies on some internal correspondence that suggested that, preliminarily, we thought that it might have been. But I think it would have suffered from many of the same defects, because I think many of the things that I said to you two minutes ago about this transaction could have been said about that transaction as well. Ultimately, you know, to us, the fact that this was, you know, not just an exchange, as my friend Mr. Levy will say, I suspect, when he gets up here, but really a complete restructuring is what makes this completely different from an ordinary repurchase. Again, the reason why there are any exceptions to what is commonly referred to as the sacred right of pro rata sharing is because those exceptions do not disadvantage other lenders in the same class. This transaction obviously did to the tune of hundreds of millions of dollars. Okay, you've saved time for rebuttal. Thank you. All right, we'll hear from Vincent Levy for LCM. Good morning, Your Honor. May it please the Court, Vincent Levy for LCM. LCM is an asset manager that bought loans on the secondary market and has been challenging this open market issue for four years, and we're only here on the open market issue, not the indemnity. In terms of Mr. Shenmugin stole my thunder in some respects, our contention really is that a restructuring is not an open market purchase, and that's what differentiates it. And I think I want to pick up a bit, in the interest of avoiding repetition, with some contextual points that we make in our brief and really start with 2.18c of the agreement, which is one of the pro rata provisions. Judge Haynes, this is the provision that also says, if one of the lenders receives something in excess of what it is allowed, it has an obligation to the other lenders to pay it back. So on remand, we would expect to rely on that provision. Now, that provision has exceptions to the requirement to pay back payments received non pro rata, and those exceptions are set forth in four provisions of the contract. 2.22, which sets forth incremental restructurings. 2.23, which sets forth another sort of restructuring. 9.02c, which sets forth a third type of refinancing or restructuring. And then 9.05g. Well, my question was how the bankruptcy affected you all, and Shenmugin did not seem to think it did, and so that's what I was asking. And are you agreeing with that? I agree completely. We retain a claim that it will be for remand against the other lenders. But I wanted to start there because the provision that makes that clear, 2.18c, which is the pro rata sharing provision, has these exceptions, and three of them are expressly for restructurings. And we think the fact that the parties here in the credit agreement set forth restructuring provisions in great detail is strong evidence that they did not intend, by permitting an open market purchase provision in 9.05g, to permit the sort of restructuring that occurred here. And the contextual point is important as a matter of interpretation because it is also indicative under the canon that the specific must trump over the general in New York law that that provision should be followed. Now, importantly, those provisions make clear that any exchange would have to be Perry, Passeu, or Junior, not Senior. And it would follow clearly, in our view, under New York law, that in specifying as much, that the parties did not intend, when they set forth a provision for open market purchases, to allow the lenders and the borrowers to get around that by having a different sort of agreement. There's also another provision that contextually strongly suggests their reading is wrong. And that's the neighbor of the open market purchase provision within 9.05g. 9.05g says that SIRTA may enter into Dutch auctions or open market purchases under that provision. And the Dutch auction prescription contains significant detail as to the procedure that would have to be followed. Under the reading by my friends on the other side that they give to the open market purchase provision, that provision would also capture not just the Dutch auctions that are permissible under the contract, but also those that are not. And this makes a hash of the agreement and contravenes multiple canons, well-accepted canons, of New York law, including that a contract should be read harmoniously to give meaning to all parts. If I could touch briefly on, I agree with Mr. Shinmugin on the LSTA. Judge Oldham, I don't know if you have more questions on it. I would add that the LSTA guidance says only that it applies to the repurchase up to a set dollar amount. So on its own terms, it's not what happened here. SIRTA did not go out and say we'd like to repurchase some amount of debt up to this dollar amount. Instead, it solicited bids for restructuring, and that's not an open market purchase. There was a question also about course of performance and the Apollo offer. Of course, my client did not make any offer, did not learn about the contraplay to restructuring until it was announced. I believe that's true of many of Mr. Shinmugin's clients for that matter. Under New York law, course of performance, of course, is not admissible evidence when the contract is unambiguous, which is the case here. And it's also not admissible against a party that did not engage in the conduct because it's a form of estoppel. I think unless the court has more questions, I'll pause here. I'm not sure I understood your point about the LSTA guide. It seemed to me that SIRTA went out and said we need to repurchase $1.2 billion of the 2016 debt. We'll exchange $875 billion of this new debt. $875 million of the new debt. But that is up to a specified dollar amount. Are you saying that it's like a tender or something, or we would come out and you would say, this is the amount that I need to repurchase. Who can do that for me? Right. I think it's the latter. The LSTA is not contemplating a sort of transaction where a lender goes out and says, I would like to restructure my whole debt. I'm prepared to purchase all the debt back because I'm in distress. And this is on page one of SIRTA's brief and of the PTL lenders. They both describe this transaction as arising during COVID because of its distress, because of SIRTA's distress, to recapitalize the capital structure and to obtain liquidity. That's not what the LSTA has in mind when it's describing a loan repurchase. But of course, you could engage in an open market transaction for less than the total outstanding debt. I mean, the entire secondary market are just bits and pieces, as your clients know, right, of the outstanding debt. So that's, I think I understand your point. But you're not saying that has to be all of the outstanding debt. They can obviously do some of it. Yes, clearly. I think if the LSTA contemplates a situation where a lender would go out and say, I'd like to purchase, I have $50 million in my treasury that I'd like to spend. I would like to purchase $50 million of my debt for this cash. Okay. Thank you. And you saved some time for a vote. Thank you, Your Honor. We'll now hear from Eric Brunstad from Citadel. Did I get that wrong? It's Norwegian, Your Honor, Eric Brunstad. Ah, Brunstad. It's an old Viking name, Your Honor. Fine. Good morning, Your Honor. It's Eric Brunstad on behalf of Citadel, case number 23-20363. I'm here to talk about the indemnity. But, Judge Haynes, I wanted to answer your question, I think, as I understand it, as it relates to the indemnity about what happened in the bankruptcy. The excluded lenders, as a result of the 2020 transaction, were subordinated. So their claims did very poorly in the bankruptcy. They got very little value. The PTL lenders, on the other hand, did very well because they were seniors. So they recovered. They did very well in the bankruptcy. This is relevant to the indemnity provision because the indemnity provision is basically an insurance policy. It existed under the 2020 transaction documents, such that the parties knew this was risky, such that if the excluded lenders sue the PTL lenders and win, CERTA has to pay. And this could be upwards of a billion dollars in liability. That's more than CERTA is worth, Your Honor. If this indemnity is triggered, it could potentially wipe out the entire company. That's why we care. Okay. So what is this indemnity? Well, originally in the plan, when CERTA filed for bankruptcy in 2023, they filed their bankruptcy plan the next day. They provided this indemnity arrangement, the old indemnity under the documents, just survives in bankruptcy, up until the eve of confirmation, when they realized that was not going to work. Why? Because of Section 502e1b of the Bankruptcy Code. 502e1b disallows absolutely contingent reimbursement obligations just like this pre-bankruptcy insurance policy. You cannot do that as a matter of bankruptcy law. Why? Because we don't want, Congress says we don't want these kinds of indemnity obligations to survive because it could be potentially devastating to the debtor and totally jettison any benefit of reorganization, which is exactly the prospect here. On the eve of confirmation, they realize that's not going to work. I know we'll just switch the label. It's no longer a pre-petition indemnity, which is impermissible under 502e1b. If they post new go-forward indemnity as a settlement, there you go. But Ken and Shanmugam said that essentially the favored lenders are now really in charge of CERTA. So in a way, it's kind of like if I'm indemnifying myself, does that really matter? It does, Your Honor, because Citadel, all the claims of the PTL lenders and Citadel were put in Class 3 and Class 4. Citadel didn't participate in the 2020 transaction. It's not being sued. It has no indemnity claim to process through this plan of indemnity. Here's the punchline, Your Honor. If this indemnity is triggered, the PTL lenders become the new owners of CERTA. Let's say the excluded lenders get a half-a-billion-dollar judgment against the PTL lenders. PTL lenders can put that over onto CERTA, and now they have a $500 million claim against reorganized CERTA. Citadel, which didn't participate, which doesn't have an indemnity claim, but got exactly the same consideration because we're in the same class, we got equity in Class 4, just like they did, equity shares. Our equity is wiped out completely, and they walk away owning the company. That is why it's not the same treatment. And here is the key legal concept, I think, Your Honor. And that is they say, and bankruptcy judge Jones approved this, on the basis, well, it's a settlement to get the vote of the PTL lenders. Here is what the Supreme Court in Avon Park said about these special inducements. A plan, quote, would not be confirmed where one creditor was obtaining some special favor or inducement not accorded the others. If a vote is influenced by the expectation advantage, it cannot be considered an honest and unbiased vote. That rule is but part of the general rule of equality between creditors applicable in all bankruptcy proceedings. The imprimatur of the federal court should not have been placed on this plan. You cannot give a special inducement, by settlement or otherwise in bankruptcy, to someone to get their favorable vote that gives them better treatment than others like Citadel are receiving. Not only is this an end run around 502E1B, it is also a plain violation of Section 1123A4 of the Bankruptcy Code, which says everybody in the same class must be treated the same. As the Quigley case explains that we cite in our papers, that means you must get equal value. Citadel is not getting equal value with the PTL lenders, even though we're all in the same class. Why? They have an indemnity provision that they can invoke that's potentially really valuable to them, gives them a huge value. It only burdens us if this indemnity provision is triggered. They have potentially half a billion, billion dollar claim against CERTA. They own the company. We got stock, just like they did. We're wiped out. It's as though the debtor were saying we're giving an insurance policy to all this class of homeowners, but only half the class owns homes. The ones who don't own homes, the policy is useless. But again, not only does this policy not benefit Citadel in any way, the indemnity did not benefit Citadel in any way, it burdens Citadel by potentially wiping out its interest. That is not equal treatment under Section 1123A4. You can't do that by virtue of a settlement. You can't do it to get the favorable vote of the parties. The Supreme Court shut that down, and that is what 1123 codifies. Can we talk about the remedy? Can we talk about the remedy? Imagine that you're right about all of this. I take it that you want us to basically blue pencil the indemnity provision. You don't want to undo the claim confirmation. No, Your Honor. Consistent with this court's decision in Pacific Lumber, in Highland Capital, in Scopack, in a whole host of the more recent court's decisions on equitable mootness, the court says, look, equitable mootness is, we address it with a scalpel, not an axe. What we do is the least amount of damage, we do the most surgical relief that we can provide that will give you a remedy. So in Highland Capital, the court just simply directed the excising of the impermissible exculpation clauses. In Pacific Lumber, the court ordered the excising of the impermissible third-party releases. So here we're saying the same thing. Just excise the impermissible plan indemnity. It should not have been in the plan. It's unlawful. And that's the point. What is it about this plan that is unlawful? It is the indemnity provision, not the other considerations. It's the indemnity provision. That's unlawful. So just excise it as the court has done in analogous circumstances in other cases. Yes, Judge Oldham. If Citadel was going to proffer a million dollars worth of its, I guess, did you guys get any debt in Class 4 or you only got stock? A little bit of take-back debt in Class 4. I thought you did. The vast majority of the consideration in Class 4 was the equity, 99% of the reorganized debtor's equity. Suppose you took a million dollars of your Class 4 debt and you put it on the secondary market, and the PTL lenders put a million dollars of their Class 4 debt and they put it on the open market. Would those trade at different prices? I'm not sure, Your Honor. It depends on to what extent the market would link the benefit of the indemnity to those shares. The whole pitch here is you all got really hammered in Class 4, whereas they got really benefited in Class 4. I gather I'm having a little bit of a hard time understanding. I mean, I get from your perspective why you feel like the disparate treatment. I understand it. I'm just trying to think of it from a market perspective. Yes, Judge Oldham. Well, Avon Park actually answers that question, Your Honor. In Avon Park, you had all the bondholders were in the same class. But some of the bondholders, in addition to getting the same distribution, in this case equity, in that case new debt, right? In addition to getting that, some members of that class were getting additional fees and benefits on top of the general distribution. And that's what the Supreme Court said is impermissible. They're getting a special inducement to vote in favor of the plan. So here, what is the special inducement? Well, the special inducement is not the equity. We're all getting the same equity. Citadel got the same equity as the PTL lenders in Class 4. The problem is this additional consideration the PTL lenders got. And the parties conceded below this was plan consideration. This plan indemnity is part of the compensation they are receiving. Of course, it is something of great value to the PTL lenders, and it's a negative value to Citadel. Why? Again, because the PTL lenders are the only ones who can benefit from it. Citadel cannot. It does not have an indemnity claim whatsoever. But if it's triggered, Citadel bears the burden, must take the loss. That's the problem. Now, in Chesapeake, this Court's recent decision in Chesapeake, there was a differential between one group of creditors getting 0.1 percent and another group of creditors getting 20 percent recovery. And the Court, in the opinion, condemned this. The sort of disparate treatment the Court said is insupportable and eye-popping. It can't happen. But also there's another feature of Chesapeake I'd like to mention, and that is the Court condemned the idea that you could, through a settlement, sort of revivify a dead claim. And the Court said you can't do that. But that's exactly what's going on here with respect to Section 502e1b. The prepetition indemnity claim must have been disallowed. It was disallowed. The record is clear on that. It's impermissible. They simply slapped a new label on it and said, there you go. But under this Court's decision in Ultra, which applied the same statute, Section 502, just a different subsection, the Court said we don't allow easy end runs around these statutory prohibitions because if you could, then they could always be evaded. So that's what's happening here, Judge Oldham. Well, I'm certainly familiar with Ultra. Yes, Your Honor, I know. But obviously our answer to that is that your clients prove that it's not the same, right? I mean, the existence of the secondary market purchasers proves that it's not the same indemnity clause, right? Because the prepetition one applies to people who participated in the 2020 transaction and held their debt until the bankruptcy in 2023, whereas the planned indemnity only applies to the people, right, who – it does not apply to you, I guess is a better way of saying it, right? That's the point, Judge Oldham. It never applied to us. It doesn't apply to us. But look what the coverage of the two policies, so to speak, are. They're identical. They cover prepetition alleged malfeasance. And then we're taking that obligation, putting it over on the debtor, and the impact is different. Quigley, I think, is relevant here because in Quigley, the court looked at, look, it's not equal treatment where some creditors are giving up valuable claims in exchange for a 7.5 percent distribution and others are giving up worthless claims. You're not being treated the same. They're taking a formalistic view on this, whereas I think under this court's precedence, you need to take an economic view, an economic equivalence view. The economics are just not the same, where if the indemnity is triggered, the PTL lenders end up owning the company and we end up being wiped out. Last question. Yes, Your Honor. What is your best case that equitable mootness doesn't prevent us from striking an indemnity clause in this circumstance? The two best cases, Your Honor, Highland Capital, the exploitation clause being stricken, Pacific Lumber, the third party releases being stricken, but also Texas Grand Prairie, where this court said equitable mootness protects only third parties not before the court. Everybody here is before the court, Your Honor. So equitable mootness simply doesn't apply under this court's decisions. There's also the Scopack case, where you have the parties are all before the court. They took the litigation risk that they would lose on appeal. It only involves them. It only involves us. Equitable mootness is not designed for this kind of case. Okay. Thank you. And you've also saved time for a vote. Thank you very much, Your Honor. And now we will hear from the other side, Gregory Silbert or Serta Simmons. Good morning, and may it please the court, Greg Silbert from Weill for the debtor. I will address the open market purchase issue, and I will begin with what is undisputed. Every party before you today agrees on the definition of open market purchase. We all agree that an open market is one where willing parties can participate and prices set by competition, and we all agree that a purchase is an exchange for cash or a cash equivalent. Where we disagree is whether the prevailing lender's assignment of debt to the issuer fits that definition. But when the appellants tell you that it doesn't fit, they are forced to rely on new requirements and conditions that cannot be found in their own definition and that are inconsistent with the terms of the credit agreement. For example, the appellants tell you that an open market is one where anonymous parties are matched up by a broker-dealer, but then right away the appellants walk that assertion back. At pages 11 to 12 of their reply brief, the competing lenders, who call themselves the excluded lenders, admit that a direct transaction without using a broker-dealer also qualifies as an open market purchase. And as you mentioned, Judge Oldham, that is in fact the exact scenario that is described in the LSTA guidebook issued contemporaneously with this agreement in 2017. It says that direct negotiations between an issuer and a lender are an open market purchase in the syndicated debt market. In fact, it says nothing at all about anonymous parties or a broker-dealer. Is a Dutch auction an open market transaction? It is not, Your Honor. Why is it not? A Dutch auction mimics a tender offer. So there are three types of repurchase methodologies that are used in the syndicated debt market. There is the open market purchase option. That's the one before you today. There is also a tender offer, and there is a Dutch auction. Now, this agreement, the 2016 credit agreement, it allows only two of them. Some agreements allow none. Some agreements could allow all three. This one allows two. It allows open market and Dutch auction. But open market is distinct from both a tender offer and a Dutch auction because in an open market purchase, the price is negotiated by the buyer and the seller. In a tender offer and in a Dutch auction, the price is fixed and announced in advance prior to any negotiation. But in your opening, you said the price in an open market transaction is set by competition, right, in which it's hard to imagine a more competitive market than a Dutch auction, right? I mean, you've got an openly posted offer. You've got all kinds of competitive bids. The auctioneer effectively determines whether it clears. I mean, that's pretty competitive. It may be competition of a sort, Ron, but remember in a Dutch auction like a tender offer, the price at which the buyer purchases the loans is announced in advance. Once we commit to a price, that's a firm offer. We can't negotiate and change it, right? And there's one other important distinction, and this is laid out in the LSTA guidebook, which you can find at page 318 of the record. What the Dutch auction procedure does is it creates a pro rata buyback opportunity for all of the holders of the debt, right? The purpose of an open market purchase option, which is the one in play here, is specifically what we did in this case. We can negotiate directly with individual lenders, and we can buy back the debt that we want to buy back up to the amount we agreed to buy. I'm not sure — you did ask Mr. Levy about this. I'm not sure I quite understood his response, but I would say we bought — what the LSTA guidebook says is you buy back, you negotiate one-on-one, and you buy back up to a pre-agreed dollar amount. Clearly, we agreed with the sellers of the debt the amount that we were going to buy. So we checked all the boxes of the LSTA guidebook. We did exactly what was described by the LSTA as an open market purchase contemporaneously with the 2016 credit agreement in which that term was used. There's simply — I'm sorry, go ahead. Oh, please, I didn't want to interrupt the sentence. No, no, there is no requirement that parties be anonymous or use a broker-dealer. In fact, we as the borrower would have no reason to use a broker-dealer because we know exactly who holds our debt. And when we want to buy it, all we have to do is ask them, do you want to sell it? Can you think of an example of a one-on-one negotiated transaction that would implicate pro-rata sharing? Well, if the transaction that you're referring to is the assignment of debt, then we know — Or repurchase of it. Yeah, or repurchase of debt, right, the assignment by the lenders to the issuer or an affiliate of the issuer. That is the only kind of assignment that Section 905G applies to. It's always the borrower, the issuer, or an affiliate is the buyer, right? So if it's that kind of assignment, it would never implicate pro-rata sharing. And we know that for sure because Section 218C, which my friend Mr. Levy mentioned, says expressly that the pro-rata sharing right does not apply to any assignment of debt — to the compensation received as any assignment of debt. And then it goes on to say including assignments under 905G, but not limited to assignments under Section 905G. So if consideration is provided for the assignment of debt back to the issuer or to any party, then there is no pro-rata sharing right under the express terms of Section 218C. So I know we've heard a lot about pro-rata rights and subordination in this appeal. All of that is noise, okay? The 905G gate, it applies to one thing. It's the assignment of debt by an existing lender back to the issuer. There are many other facets of this transaction. And I think Mr. Shamugam, when you asked him why is this different than what the LSTA described, I believe what he ultimately said is, well, this was a complete restructuring transaction. The aspects of the transaction that one might describe as a restructuring have nothing to do with this appeal, and they are not before you today, okay? We understand that our friends, the appellants, are unhappy that they were subordinated. That subordination was accomplished through provisions of the credit agreement. Other than Section 905G, all of the amendments to the agreement that resulted in subordination would continue to survive regardless of what you hold today. So they were subordinated, they will be subordinated regardless of what you hold here. The only thing that happened in 2020 that has to comply with Section 905G is the prevailing lender's assignment of debt to us, okay? That's all that Section 905G applies to. And I think Mr. Shamugam agreed that we can go out and negotiate directly with individual holders of the debt, and we can agree to repurchase that debt at whatever price we agree on to whatever amount of debt we choose to repurchase. As your colleague we brought out, Judge Oldham, we don't have to buy the whole debt. We certainly don't have to negotiate with every individual lender. The plain language of the credit agreement makes that clear. But to the extent that we did have to, we actually did negotiate with over 70 percent of the holders of the debt. So that's clearly an open market. Remember where we started, the definition we all agree on, willing parties can participate. This was a market where every lender, every potential seller of the debt, not only could participate, the vast majority of them did participate in the negotiations that resulted in this assignment. Now, our friends also say, well, it's supposed to be cash or a cash equivalent, right? Well, at page 13 of the competing lenders' reply brief, they acknowledge that credit or debt can be used as a cash equivalent in an open market purchase. And, of course, that is not surprising because people buy things with credit all the time. You buy cars with credit, buy houses with credit. Credit is a purchase. It's not, as my friend Mr. Levy frequently says, an exchange. An exchange is chattel for chattel. So if you give me your car, Judge Haynes, and I give you my car, you might say that we've exchanged cars. If you give me your car and I give you debt, a promise to pay you money in the future, then I bought your car. And that's what we have done here. We purchased the debt using debt. If there were any doubt whether that use of debt to purchase debt qualifies as a purchase, the express terms of the credit agreement answer it. And you find that at page 196 of the record. This is section 1.09, and it is the cashless roll provision. And what it says, it's all that applies directly to the circumstances that are before you today. It says if debt is replaced with new debt issued under a different credit facility, exactly what happened here. And if there is a cashless roll, in other words, the debt is given for new debt without any cash changing hands, then that cashless roll satisfies any requirement. Those are the terms of the credit agreement, the ones that these sophisticated parties agree to. Any requirement that payment be made in cash or any similar requirement. Okay? Yeah. Can we pause for a second on the 218C argument?  Because I'm not – this is sort of – it intersects with a different question I have about Judge Jones, which is the exclusion of expert evidence and testimony in saying this is clear and unambiguous and obviously this is an open market purchase. The way I read 905G and 218C together is they have sort of a circularity to them. So in 218C, it says, as you point out, this doesn't apply to these assignments of debt. But then it also says the assignments are null and void if they violate 905G. So then you have this question. It all comes back to whether this is an open market assignment between the lenders, the PTL lenders, or the PTL parties in CERTA. And if that's not an open market transaction, then 218C, which I take as your best point in the whole agreement, renders the assignments null and void. So we all come all back to the basic question of open market. And so it's, I guess, a two-part question. One is am I misunderstanding how those 218C and 905G intersect, number one. And then number two, if there really is this kind of odd or ambiguous, I hate to use a loaded word, then wouldn't it be better to look at extrinsic evidence to try to understand how this is supposed to operate in practice? Yes, Your Honor. So I will take those two questions in turn. On question number one, it's not 218C that says the transaction is null and void if it doesn't comply with 905. That's in 905 itself. So 905 relates to assignments of debt. It says here are the different ways that debt can be assigned. 905G is assignment back to the issuer, back to us. There are other types of assignments, like to other permitted assignees, eligible assignees. And 905 says you have to do it one of these ways. If you don't do it one of these ways, the assignment is null and void. There is a separate provision that our friends talk about quite a bit but is not actually relevant here, and that is section 218C. It concerns pro rata sharing. And it says in general any kind of payment that a lender receives has to be shared pro rata with other lenders of the same class. That makes sense, right? And then it goes on to say, and this makes a lot of sense too, but if that payment is consideration for the assignment of debt, this provision does not apply. So there is no pro rata sharing right for the assignment of debt, period, all stop. And if it turns out, if you were to say, well, you know, no, this transaction did not comply with section 905G, obviously we don't think you should hold that, but if you did, it still would not implicate any pro rata sharing right. At most it would mean that the transaction is null and void and would have to be accomplished in another way, which it could be. As we pointed out, if the prevailing lenders had simply given us cash for the new debt and then we had used the cash to repurchase their existing debt, so exact same result, more steps, more transaction costs, but everybody winds up in the exact same place, that would pretty much satisfy the appellant's tests for what they say an open market purchase should look like. It would just be more difficult and more expensive to get where we already are now. Sorry, Judge Haynes, you're looking at me like you have a question there. No. I ask questions when I have them. Got it. Yes. All right. Okay. Thank you. Thank you. I'm well aware of how to ask a question. Yes, of course. But thank you for doing that. No, no. Of course, Your Honor. I just wanted to give you room. So I think just to go back, because there was some, I think, important colloquy where you were, Judge Oldham, you were asking Mr. Shanmugam why is this different from the transaction that the competing lenders slash excluded lenders, as they call themselves, proposed, and how is it different from the LSTA guidebook? And I think the answers that you heard back were that although the competing lenders did propose this as a 905G open market purchase, and that is in the summary judgment record, by the way. It's at pages 6084, 6098, and 6112. I think Mr. Shanmugam said that now they don't view it as an open market purchase, so they changed their mind. This goes to your question about expert evidence, so I'll get to that in a second, Judge Oldham. You also asked him about the LSTA guidebook, and I think he said, well, the difference here is that this was a restructuring, and my point to you there is, yeah, but the part of it that was a restructuring has nothing to do with 905G. The only part of the transaction that does concern 905G is the assignment of debt, okay? And that was not a restructuring. That was just assignment of debt in exchange for consideration, all right? Now, you asked, well, why not allow their experts in? And the answer is, first, the bankruptcy court did consider the expert reports. He simply found them unhelpful, and they are unhelpful because they're not actual evidence of trade usage. Now, trade usage does not come in only if the term is ambiguous. That is clear under the governing New York law from the Law to Venture Trust case that we cite from the Second Circuit. You can look at trade usage to determine whether a term is ambiguous. You have those two important pieces of trade usage evidence in front of you. You have the contemporaneous LSTA guidebook, which we all agree is the authoritative source on the syndicated loan industry, and you have the competing-slash-excluded lenders' own market behavior, where they proposed exactly this form of transactions, identical in all relevant respects to the one they now challenge, at the same time. That's also trade usage, okay? So those help the court interpret the meaning of the term open market purchase. After the fact, you have these three expert reports that were prepared for litigation purposes. Those reports do not provide any trade usage evidence. They simply give the opinion of paid experts who were hired for the litigation, and they give you an interpretive methodology that, surprise, surprise, is virtually identical to the legal arguments made by the appellants. But the mere fact that these appellants can find experts who will write a report that agree with their interpretive methodology does not give you contemporaneous trade usage evidence that creates an ambiguity that would require a reversal and a trial or additional evidence like that. The court had in front of it the actual trade usage evidence, which was the LSTA guidebook and the competing lenders' own market behavior, and it looked at that evidence, it looked at the plain meaning of the term, the definitions that we all agree on, and it found correctly that this assignment of debt fits comfortably within the meaning of open market purchase. Mr. Silbert, I may have misunderstood what you said at the very beginning. Are you not going to talk about the indemnity at all? My colleague, Mr. McGill, will discuss the indemnity. I can turn to the jurisdictional issue. So I think what Mr. Samugam said is that the appeal was allowed because there was a certification under Section 158D2, and that creates jurisdiction. There are two problems with that. One of them is the interpretation of the statute, and the other one is with Rule 8006. Okay. So I don't think, and I realize this is not a point that has ever been decided, unlike whether there was a notice of appeal. I don't think there's any dispute that there was no notice of appeal filed. I'm sorry. Mr. Samugam did say under 8003 that it does count, but I believe under this Court's recent precedent in Cleveland imaging, which addressed the exact same defect in the notice of appeal, that was not a notice of appeal within the meaning of Rule 8003. So if you take that as a starting point, applying circuit law on the notice of appeal, there wasn't a notice of appeal. The question is, do you need one? And Mr. Samugam said no because of Rule, because of Section 158D2. Now, it's true that section does talk about jurisdiction. I think if you read it correctly, what it is referring to is which appellate court will have jurisdiction and not whether there is appellate jurisdiction at all. And the reason I get to that is the terms of that provision make sense only if there has been a prior notice of appeal. It talks about the bankruptcy court, the district court, or the bankruptcy appellate panel certifying on its own motion. But, of course, you would never be before a district court or a bankruptcy appellate panel unless there had been a prior notice of appeal. It also talks about a majority of appellants or a majority of appellees acting and the court having certain obligations if a majority of appellants has requested certification. But you would never know whether a majority of appellants had requested certification or not unless you already knew who the appellants are. And you would only know that if there's been a prior notice of appeal. Okay. Thank you. You've used your time. Oh, thank you, Your Honor. All right. We'll now hear from Matthew McGill for Bering Veto. Thank you, Your Honor. Matthew McGill of Gibson, Dunn & Crutcher for the prevailing lenders. I'd like to start with just a few quick points on the open market purchase provision and then I'll turn to the indemnity. First, to prevail here, the appellants need not only to overcome the court's order on summary judgment, they need to vacate the judgments on their counterclaims for breach of contract. That argument is arguably waived because they haven't urged vacature of those judgments anywhere in the brief that they rested on in their appeal. But more to the point, these judgments on the counterclaims for breach rest on a trial record and a factual finding that the objecting lenders proposed an open market purchase of only their loans that looked precisely like the open market purchase that the prevailing lenders, in fact, engaged in. That factual finding is unchallenged on appeal and I would submit it's dispositive. You have here the borrower, CERTA, and over 80% of its lenders all interpreting Section 905G in precisely the same way, which is to say the way the LSTA's complete credit guide says. This is the authoritative manual for this highly specialized trillion dollar industry and it says that the open market purchase is the most borrower-friendly alternative to the Dutch auction and it allows a borrower to negotiate with lenders on an individual basis. That is exactly what the so-called excluded lenders did before the prevailing lenders got in the door with CERTA. They had a transaction that they wished to do. They were going to use the open market purchase provision. And now the counsel, my friend, says that that was legally incorrect. That is sharply at odds with the testimony before the bankruptcy court where the partner from Apollo, Mr. Kwan, testified that we pride ourselves on our diligent underwriting. This is at page 25491 of the record, and particularly underwriting our views on the credit agreement. And at page 2492, we will scrutinize those provisions very closely. Those are usually highly negotiated during the issuance and the creation of the credit agreement. But now, supposedly, it was just wrong that their conclusion that this was an open market purchase simply was incorrect. In the LSTA's definition of open market purchase, in fact, that same distinction that it can be negotiated with lenders on an individual basis, an open market purchase, that same distinction is borne out in the text of section 905G. The Dutch auction must be open to all. No such requirement is imposed on the open market purchase. You have 55 pages of defined terms in this agreement. No definition of open market purchase. That's because everyone in the marketplace knows this term to have a clear and unambiguous meaning, which is found in the LSTA's complete credit guide. The final point I'll make on this, on the open market purchase, is that this, in fact, was a very open process. The excluded lenders were in the door first with CERTA. CERTA ultimately engaged with over 70% of its lenders. And even at the very end, CERTA invited one of the excluded lenders, Angelo Gordon, into the deal, and they declined. What they did instead, and this gets to your earlier question, Judge Haynes, was they threatened litigation. They offered $30 million to my clients to just shelve their transaction and join forces with them. They declined. This was a contest of financial titans. There was a dream team of hedge funds on one side and a dream team on the other. And there had to be, as Judge Jones said, a winner and a loser. That was the way their transactions were designed. It was a very open process. CERTA engaged with all kinds of lenders. It was a robust competition. There was a winner and a loser. What were offered from the other side to define open market purchase is a rotating cast of hallmarks that come and go, and it boils down to whether it's substantially similar to the secondary market or perhaps maybe whether it's at or near the market price. Of course, the excluded lenders' own proposal was within one cent of the prevailing lenders. They offered 75 cents. We offered 74. So that was the market price for this repurchase of debt. This rotating cast of hallmarks, of course, could not possibly be applied by persons in the marketplace. There's no way to know which hallmarks are applying and when when you're attempting to understand whether your open market purchase is one that you could engage in. Mr. McGill, if CERTA decided that they wanted to buy a million dollars of their own debt back and they went to, I don't know who makes these markets, Goldman Sachs or something, and said, you know, can you go find us some TTLs, some preferred lenders who can sell us a million dollars, and it was on the normal secondary market, right? They don't care who it is. They're not doing one-on-one. They go to a broker-dealer and they say, I want to buy a million dollars. That's obviously a transaction in that way. The traditional secondary market, that's an open market transaction, right? Like, you don't dispute that that is. I would agree it is. It's not one that CERTA ever would engage in because they don't need to engage an expensive broker-dealer to transact with their own lenders. They know who their lenders are. So here's my struggle. The traditional broker-dealer secondary market thing, if that's an open market transaction, it seems hard to read open market transaction to also mean a one-on-one thing clouded in NDAs, you know, everything done in the cloak of secrecy, because I assume that you're understanding the open market transaction. This obviously involves lots of TTLs, but you could have done it with just one, right? So I think the way I would answer your question, Judge Oldham, is that this open market transaction, it's the open market for CERTA to repurchase its own debt. And so CERTA is not using the secondary market. So that secondary market is typically for lenders to buy from other lenders. So this is, it is the open market for CERTA to go to its own lenders and say, will you sell me your debt at X price? That's the open market. Is your position in the syndicated loan industry that debt or that borrowers don't use the secondary market when they want to repurchase debt? That's my, it's not that they cannot, but it's my understanding that they generally do not because it's not, it's expensive. And they don't need to. They know who their lenders are. And they can transact at scale when they go to, when they go directly. I want to turn to the confirmation issues. I'll start with the very basic point first. If you rule for us on open market purchase, I think I've heard my friend agree that the confirmation objections relating to the indemnity are by the board and you don't need to address them. So I take that point to be conceded. The second point, the blue penciling relief sought by the other side is highly problematic. This court's decision in Crystal Oil makes crystal clear that if a creditor is going to be made to surrender benefits that it bargained for in agreeing to a confirmed bankruptcy plan, it has to have a chance to reevaluate those concessions that it made to get those benefits. What they are really arguing for is a post-consummation modification of the plan that would be flatly barred if it were requested in the bankruptcy court by section 1127B of the bankruptcy code. Under this court's decision in Highland Capital at 57F 4th at 501, it's a modification if it alters the rights, obligations, or expectations of the parties. We unquestionably are a party to the plan, so is CERDA. The entire point of this challenge to the indemnity is to alter our rights and obligations under that. It's also undisputed that this indemnity was critical to the deal. Mr. Chopra's testimony at page 3298, Mr. Tetler's testimony at page 3239, both communicate that the deal depended on this indemnity being included. So you're saying we don't have the authority to simply pull back the indemnity and leave the rest the same? No, Your Honor. I think under this court's decision in Crystal Oil, we would have to be provided the opportunity to re-vote, and that could undo the plan. And this is what section 1127 does require when there is a post-confirmation modification. You have to have a new disclosure statement, a new voting and acceptance process, which is essentially, to say, a do-over. What is your best argument that the PTL parties and Citadel were treated equally in the same class? They each have the same indemnity. Citadel hasn't been sued yet. So what is the value of the indemnity to your clients? I'm sure you've done evaluation of it. Not to my knowledge. I certainly have not, and I'm not aware of it. Is it fair to say it's more than zero? I would assume that they attach value to the indemnity because it was critical to the deal. We would not have done the deal without the indemnity. So if you can't do the deal without the indemnity and you're here defending it, which obviously this all costs money, and I think it's fair to infer that the value to your clients of the indemnity is more than zero, then the value to the Citadel parties of that indemnity is exactly zero, right? I mean, it can't possibly apply to them. No, it's not. I would not agree with that, Your Honor, because they have not had a cause to make a claim under the indemnity yet, but they are insured. They are covered against this kind of loss. But what would be the nature of their loss if they bought the debt on the secondary market, they weren't parties to the 2020 transaction, how could they ever invoke the indemnity? It's like having insurance on property you don't own. Well, maybe the liability travels with the debt. Why would it do that? By the terms of the indemnity, it doesn't. I'm not aware of the terms under which Citadel bought its debt on the secondary market, but it's not inconceivable to me that they could be sued for buying debt that came out of the 2020 transaction. And if they are, at some point in time, they would be covered by the indemnity. But this is far... We don't have to show that Citadel has the same benefits or enjoys the same benefits from every provision, every term of every provision of the plan. All we have to show is that they are treated the same. They have the same contractual rights as our clients do. Those contractual rights happen to be more valuable to our clients than them right now. But that may change. And of course, if you rule for us on the open market purchase provision, as I think Mr. Brunstad has conceded, then the indemnity is equally valuable to us all. Would you agree that if... I understand your argument that the indemnity offered in the plan is different than the indemnity that was washed out by the code as a disallowed contingent obligation of the debtor. I understand that argument. But if the indemnity in the plan was identical, would you agree that you cannot do something in a settlement on the backside through 2003 that would be disallowed by the code on the front side by the code disallowance provisions? The indemnity is not the same, but I still would not agree. Because it's not a... If it's a pre-petition obligation, then it can't be included in the plan. But this is not a pre-petition obligation. This is a... There's two things that demonstrate that is true. One is that the indemnity is only as of the effective date of the plan. So it's obviously... It's a post-plan obligation. But the second point is that it covers different people. It covers not the PTL lenders. It covers the members of Class 3 and Class 4. So if you were a PTL lender and you sold out of the position and you are sued for being an original 2020 PTL lender, you are not covered anymore. I'm sorry to interrupt, but I hear you. But I gather that both of those points are disputing my hypothetical, because those are both why the plan indemnity is different than the disallowed pre-petition code indemnity. By code indemnity, I just mean the one disallowed by the code. My question for you is, could a debtor go in a plan confirmation and say, Judge, I know this is a contingent obligation. It is barred by the code. I could not have put it in proof of claim. So you could put it in proof of claim, but it would be disallowed in the plan. But we're doing it as a settlement, and so we're allowed to resurrect the previously dead contingent obligation. That's my question. I'm not trying to fight the hypothetical. I think it is still possible that... So what 502 governs is what is included in an allowed claim. What governs what can be settled as part of a resolution of those allowed claims is 1123 and 1129, so not 502. So my submission would be that you could have the same indemnity, a debtor could agree as part of a settlement to the same indemnity if it otherwise complied with all of the requirements for plan confirmation. Thank you. I want to then just quickly address, very quickly, the fair and equitable argument that settlement with Class III and Class IV was the only way CERDA could promptly exit this bankruptcy with a right-size balance sheet. The testimony is undisputed that the indemnity was critical to that settlement. Without the indemnity, there is no settlement. There is no prompt exit from bankruptcy. That is sufficient to demonstrate that this was fair and equitable and in the best interest of creditors. And, finally, I think I can put the feasibility argument to bed in just a couple of sentences. This is a clear error review, and the debtor's testimony here is completely unrebutted. There was no evidence put on by the other side, no witnesses put on by the other side that the plan was not feasible. The decision of CERDA not to value the indemnity at that time, is it completely in accord with general accounting principles? And there's no basis for the Court to, I would submit, find clear error in that determination by the Bankruptcy Court. If there are no further questions, I thank the Court for its time. I'm going to ask one more. I'm sorry to keep you up. I want to go back to open markets. I want to make sure you had a chance to get out everything you wanted on indemnity. But, very simple question, borrower goes to lender, just one, let's call it bearings, and says, super secret, just the two of us, NDA, I would like to buy back some of my debt. Will you sell me some of my notes? Is that an open market transaction in your view? Just one-on-one, totally secret, and you have to sign an NDA. I don't want anyone else to know that I'm doing this. Just the two of us. Open market?  And I would say it completely accords with what the LSTA is talking about, and that is the industry manual. And that's open in what sense? It's open as to CERTA. This is a market for CERTA and borrowers to repurchase their own debt. That is the only market that we're concerned with here because this is the open market purchase provision relates only to borrower repurchases of their own debt. Okay. Thank you. Thank you, Your Honor. We'll now hear your rebuttal. Thank you, Judge Haynes. Just three points in my three minutes. First, Mr. Silbert suggests that the parties agree on the definition of open market purchase and that reversal on that ground would not necessarily trigger the pro rata sharing provision. And we simply disagree with both of those things. As to the definition of open market purchase, the appellees here are defending Judge Jones's definition and even taking Mr. McGill's point that we should look to Judge Jones's post-trial ruling on this issue. At page star 11 of the Westlaw opinion, he defined open market purchase as something obtained for value in competition among private parties. And we simply disagree with that definition. It suggests that any arm's-length transaction in which there is a modicum of competition is sufficient. That simply contravenes the ordinary understanding of open market purchase. And this case was litigated below on the understanding that the definition of open market purchase would be dispositive of the parties' rights under the pro rata sharing provision. I would refer the Court to the discussion at page 6 of our reply brief and page 3 footnote 1 of LCM's reply brief. Second, as to the LSTA guidebook, the relevant language is at page 38 of the favored lenders' brief on the open market purchase issue. It indicates that in some circumstances a borrower can negotiate one-on-one with individual lenders to repurchase loans. Consistent with that language, we can see that in some circumstances a private transaction will qualify. But I think it's quite clear from the most recent colloquy between my friend Mr. McGill and Judge Oldham that the position that the other side is taking is that any private transaction qualifies as an open market purchase, even the one-on-one transaction with an NDA. There is nothing open about that purchase at all. It is certainly not taking place on the open market. And what took place here was decidedly not CERTA going to the marketplace and saying we want to buy back $1.2 billion in debt. Quite to the contrary, it was going to the market to seek new money in order to address its liquidity issues. And so this was not a simple transaction with individual lenders. CERTA assembled a group of lenders, not accidentally 50.1% so that it could amend all of the relevant agreements in a bespoke recapitalization deal. And, of course, even leaving aside that requirement of openness, none of the other requirements were satisfied here. And in my remaining seconds, my third and final point. If this Court were to uphold Judge Jones's ruling here, it would blow up the fundamental right to pro rata treatment in this enormously important market, the market for syndicated loans. And that is for the simple reason that a group of lenders to a single credit agreement could simply enter into side agreements to deprive other lenders of the sacred pro rata sharing right. That is why this case is so significant. And while we certainly don't think that this Court needs to resolve every hypothetical in order to reverse, a reversal here would eliminate the cloud on that right that Judge Jones's ruling has created. Okay. Your time has expired. Thank you. Mr. Levy? Thank you, Your Honor. Just to cover a couple of points, and I will try not to repeat what Mr. Shunmugam said. Number one, just to correct a point about whether an assignment has to comply with 905G, 905A makes clear that an assignment has to comply with 905G otherwise it is void. The assignment here did not comply because it was not an open market purchase, as Mr. Shunmugam explained under the plain ordinary definition. And Mr. McGill has said that a private negotiated transaction was an open market purchase. We simply don't agree with that. The Second Circuit has said otherwise in a criminal case. I'll be in a different context, but it involved a financial instrument, and there's no reason to reach a different conclusion. Here, that's the Bilzerian case cited in our brief. And then turning to 2.18C, which my friends discussed at some detail, it says that SIRTA could enter into restructuring. It could do so under 2.22, 2.23, or 9.02C. 9.05G is about repurchases of debt, not a restructuring. And the provisions that specifically address restructurings make clear that those have to be parapsu or junior. And it simply makes no sense to conclude that by allowing open market purchases, the parties intended to permit a simple majority to override the prorater requirement, which requires agreement of all adversely affected lenders, simply by branding it an open market purchase. That's not permissible under New York law. And I would add that although my friends keep saying that the amendments are separate from and apart from the transfer, as a matter of contract, the parties to the 2020 transaction made one a condition subsequent of the other. So that's simply not true. Thank you. Okay. You ended at exactly zero. And finally, we'll hear from Mr. Bronstad. Judge Haynes, A-plus. Thank you. Judge Oldham, you cannot settle what the Code prohibits. That's the Supreme Court's decision in Jevic. That was a settlement for a structured dismissal that varied the Code's priority rules. The Supreme Court emphatically answered no, you can't do that. This Court's decision in Chesapeake Energy, no, but they were trying to settle to give another creditor group 20% recovery. This Court said no, you can't do that. You can't do an end run around the Code's provisions that way. You can't do an end run around 502E1B. We did not concede, I did not concede, that if the Court rules against the excluded lenders, therefore the indemnity issue is moot. That is because as long as the excluded lenders are suing the PTL lenders, the indemnity issue remains live. It requires them to pay their fees, et cetera. It's extremely valuable to the PTL lenders, Your Honor. And it's not just that it's of no value to Citadel, Your Honor. It's of negative value to Citadel because if the indemnity is triggered, this company is not worth what the indemnity might be, which would completely wipe out Citadel's recovery, which is equity in the company, and they would be the new creditors of the company. So it's obviously a different treatment. Mr. McGill conceded that this indemnity was an inducement for them to vote in favor of the plan. But as the Supreme Court held in Avon Park, giving someone special treatment, something more than the others are getting, is flatly prohibited. It violates equality of distribution. That result is codified in Section 1123A.4. You must get the same treatment. There's only one statutory exception, and that is where the disfavored party agrees to less favorable treatment. We did not so agree. Mr. McGill's argument about the court has no authority, that was exactly the argument this court rejected in Scopak. There, the court observed that the judgment might have adverse consequences to the parties who were found to be not successful is not only a natural result of any ordinary appeal, one side goes away disappointed, but adverse appellate consequences were foreseeable to them as sophisticated investors who opted to press the limits of bankruptcy confirmation and valuation rules. Here, they pressed the limits of 502E1B in Section 1123A.4. Mr. McGill's argument is exactly also the one the court rejected in Pacific Lumber and Highland Capital, where the court struck the unlawful exculpation clauses and the unlawful third-party releases. This disparate treatment, the planned indemnity provision, is just as, if not more, unlawful because it plainly violates Section 1123A.4 and is an end run around Section 502E1B. Thank you, Your Honor. Okay, thank you. I want to be clear that we only consolidated the cases for oral argument. It's still 2-in-2 in terms of before us, but I thought it would be helpful to hear from you overall, and I think it was helpful doing it this way. Thank you all very much. We're going to take a short 10-minute break and then return for the final.